difficulty in applying the rule above referred to where the statements and representations were made four years before the deed was given. This ground for relief was not, apparently, in contemplation when the action was commenced, because no facts constituting estoppel were alleged in the complaint, and no relief was asked for, based upon such a theory. The only ground for relief stated in the complaint was title by prescription. The trial court also found that there was something like a practical location of the line between the properties of the parties. Nothing of that kind was alleged or suggested in the complaint, and the proof does not establish the fact. Concededly, the line between the properties was such as to place the spring upon the defendant's, and not upon the plaintiff's, premises. The real claim is not that the plaintiff owns the land on which the spring is located, but that, as appurtenant to her property, she has an easement—the right to use the water from the spring. The trial court also found that the intent and agreement between the husbands of the parties was that the spring should pass under the deed of 1886. Even if there is proof to sustain such a finding, legal effect could not be given to such intention or agreement, because it would be outside of the deed, and would tend to contradict it, and would violate the statute. The only relief the plaintiff would be entitled to would have to be based upon the theory of estoppel, as we have already shown.

It is suggested, also, that there is no sufficient proof of plaintiff's title to the property covered by her deed, the two deeds recited therein to have been given not being in evidence. We do not regard it as necessary to pass upon this question, however. A new trial must be had, and very likely those deeds will then be produced and put in evidence.

The views expressed lead us to conclude that the judgment should be reversed, and a new trial ordered, with costs to appellant to abide event. All concur, except HISCOCK, J., not sitting.

---

(81 App. Div. 344.)

### TOMPKINS COUNTY v. INGERSOLL et al.

(Supreme Court, Appellate Division, Third Department. March 17, 1903.)

1. PAYMENT INTO COURT—INVESTMENT OF FUNDS—TRANSFER OF SECURITIES— ORDER OF COURT.
   Code Civ. Proc. § 751, providing that no money, securities, or other property placed in the custody of the court shall be surrendered except under a properly certified copy of an order of the court, prohibits only the payment of money out of court upon claims of ownership, and does not apply to the transfer or assignment by the county treasurer of securities in which funds in the custody of the court are invested.

2. SAME—POWERS OF COUNTY TREASURER—TRANSFER OF SECURITIES.
   Code Civ. Proc. c. 8, tit. 3, providing for the payment of money into court, and the care thereof, directs money paid into court to be turned over to the county treasurer, and by him invested under direction of the court, which may order a change in the method of investment when the interests of the owner require it, and provides that the treasurer takes title to the securities purchased in his own name, and empowers him to maintain actions thereon. *Held,* that the powers of a county treasurer in the control of funds paid into court are the same as those

of other trustees, and he may sell, transfer, or discharge mortgages or other securities according to his best judgment, without order of the court.

**8. SAME—TRANSFER OF SECURITIES—MISAPPROPRIATION OF PROCEEDS—BONA FIDE PURCHASER.**

A bona fide assignee for value of a mortgage executed to a county treasurer to secure a loan advanced from funds deposited in court, takes good title thereto, notwithstanding the treasurer used the money received from the assignment to replace court moneys wrongfully converted by him.

Appeal from Surrogate's Court, Tompkins County.

Action by the county of Tompkins against Monmouth H. Ingersoll, as executor of the will of Charles Ingersoll, deceased, and others. From a judgment for plaintiff, defendant William P. Harrington appeals. Reversed.

The fund over which this controversy arises was derived from proceedings to sell the real estate of Fred Whitlock, deceased, to pay his debts, taken in the Surrogate's Court of Tompkins county. It consists of the surplus moneys belonging to his widow and infant heir, and was in the custody of that court to be invested for their benefit. Under the provisions of section 2796 of the Code the decree which distributed the same should have provided for its investment "in the public securities of the state, or of the United States; or for the loan thereof secured by bond, and by mortgage upon unincumbered real property within the state, worth at least, exclusive of buildings thereupon, twice the sum lent," unless the court, in its discretion, had directed that it be paid to the infant's general guardian upon proper security given. As I understand the record, the decree in this case directed as follows: That said fund "be invested at interest, by the county treasurer of Tompkins county, in the manner provided by law." It appears that the county treasurer received such money on or about November 26, 1897, and, instead of investing at once, he deposited it to his credit, as such treasurer, in the Ithaca Trust Company, where it drew 3 per cent. per annum. Subsequently, on September 1, 1898, such treasurer applied to such surrogate's court, on his own petition, for leave to loan $500 thereof to Mrs. Ophelia J. Seeley, to be secured by a first mortgage upon certain premises therein described, and stating that such property was worth $4,000, and that such loan would draw 5 per cent. interest. The surrogate made an order directing that such loan be made, and a mortgage was thereupon executed by Mrs. Seeley to Charles Ingersoll, county treasurer of Tompkins county, his heirs and assigns, to secure such amount, and was thereupon delivered to and held by him for about one year. Subsequently such treasurer used and appropriated to his own use a large amount of the court funds in his hands, and on September 7, 1899, he sold and assigned the mortgage in question to William P. Harrington for the full face thereof and accrued interest, and used the moneys so received to replace other court moneys so converted by him. Such purchase was made by Harrington for full value paid, and in good faith. The treasurer subsequently absconded, being indebted for such court funds in a large amount, and the question now arises between said Harrington and the sureties upon said treasurer's bond upon whom the loss shall fall. The action is brought by the successor of such treasurer to recover the amount, with other amounts converted, against such sureties, under the provisions of section 147 of chapter 686 of the Laws of 1892, as amended by chapter 112 of the Laws of 1901, said Harrington being made a party to the action. The sureties claim that the assignment of such mortgage to Harrington, having been made without any order of court, was without authority, and did not operate to pass any title to him; that such mortgage is still the property of such treasurer's successor; and that hence they are not liable for any loss on that account. The said Harrington claims that he acquired good title to the same. The trial judge held that no title passed by the assignment, and ordered judgment accordingly. From the judgment so entered, said Harrington takes this appeal.

Argued before PARKER, P. J., and SMITH, CHASE, CHESTER, and LYON, JJ.

Geo. S. Tarbell (Randolph Horton, of counsel), for appellant.

Newman & Blood (Jared T. Newman, of counsel), for respondent the county of Tompkins.

Halliday & Denton (E. A. Denton, of counsel), for other respondents.

PARKER, P. J. I do not find that either the court or the comptroller has ever made any rule prohibiting a county treasurer from selling and delivering a mortgage or other security without an order of the court. Nor do I find any provision of law to that effect. With the claim of the respondents that such an act is prohibited by section 751 of the Code I cannot agree. The term "surrender" does not express, or in any sense suggest, the transaction of a sale and delivery. It involves the idea of yielding—of delivering in response to a demand; and I cannot conceive that by the use of such word the Legislature intended to include every transfer or delivery that it might become necessary for a treasurer to make in the course of the management of any particular fund. The section, prior to the amendment of 1892, applied to money only, and prohibited the payment of it out of court without a court order. It was intended to apply to those instances where the party to whom it was ultimately to be distributed claimed that the event had happened which authorized its delivery to him, and it was so universally interpreted. A transfer of such money, by the treasurer, from one bank to another, or from a bank to an investment in securities of any kind, was never controlled by such section. So long as it remained in the custody of the treasurer, it was still in court, and not affected by the section. It was only when the court parted with all control of it—surrendered it to the alleged owner—that such section applied. The amendment of 1892, having the same purpose in view, simply enlarged the prohibition so that it should apply to securities as well as to money. The section was not designed to protect funds or property in court from misappropriation by the county treasurer, but from being surrendered out of the custody of the court upon claims of ownership unlawfully made.

Nor do I find anything in the other sections of chapter 8, tit. 3, of the Code, that in terms forbids such a sale and transfer by the treasurer. The scheme of that title is substantially as follows: When a final judgment or decree directs merely that money be paid into court, it must be paid to the county treasurer. There does not seem to be any provision requiring him to invest it, but he must deposit it in such trust companies as the comptroller has designated. The court may, however, and in most instances must, direct in the final judgment or decree that the money, when so paid into court, shall be invested by the county treasurer in the public securities of the state, of the United States, or in bond and mortgage upon property worth twice the amount loaned. When so directed, it is the duty of the treasurer to invest accordingly.

There is a further provision in section 747, which, in substance, authorizes the court at any time to direct that money which has been paid into court may be changed from one method of investment to another upon its being made to appear by proper and sufficient evidence that the interests of the owners thereof require it. The purpose of this section is evidently not to protect the fund from misappropriation by the county treasurer, but to secure to the persons interested therein the right to have it invested in some manner more advantageous to them than that in which the treasurer has already invested it. All investments are taken in the name of the treasurer, and the title to the same are, by section 749, vested in him. He therefore has the ultimate control of it as long as it is in court; and hence, as in all other trusts, the protection of the beneficiaries seems to depend upon the pecuniary responsibility of the trustee and his sureties. I do not discover in the system any effort to protect the funds from the treasurer by limiting his custody or management of the same.

Inasmuch as there is no rule or provision of law that forbids the treasurer from selling and transferring a mortgage which he has taken to himself upon the loan of court funds, is there any reason why the usual principles which control the disposition by the trustee of securities belonging to a trust fund should not apply? When, by a final decree, a treasurer is directed to invest by loaning on bond and mortgage, he is given authority to keep the fund so invested. Such is the purpose of the direction, and he has, therefore, authority to change the securities as from time to time his best judgment and the exigencies of the case shall require. And his responsibility for each loan made seems to be similar to that of any trustee who loans for the benefit of the trust. I can see no reason, therefore, why his powers concerning such loans should not be similar to such other trustees. Ordinarily, trustees may discharge a mortgage taken. Clearly, it would seem that the treasurer should have that power. Indeed, section 749 gives him authority to sue for and collect, and so, in effect, gives him authority to discharge, for the right to discharge should follow the right to exact payment. And, if he may collect and discharge the mortgage, upon what theory should he be prohibited from selling and assigning it? Suppose the mortgagor cannot himself pay the mortgage when it becomes due, but can procure one to purchase and carry it for him, is there any sensible reason why the treasurer may not take the amount due thereon, and assign it to the one whom the mortgagor designates? Suppose the treasurer becomes doubtful of the security, but is able to sell it in the market for its full value, should he not have the legal power to do so at once, whenever he thinks the safety of the fund requires? Suppose the fund is invested in government bonds, and it becomes necessary to collect a part thereof to meet the claim of an infant owner who has become of age, may he not sell such bond in the market, without an order of court? The same reasons which have ever permitted a trustee, who, by the terms of the trust, is directed to invest the fund, and keep it invested for the benefit of the beneficiary, to sell and assign and give good title or acquittal thereof, apply to a county treasurer concerning his management of the court funds; and I am of the opinion that the question whether he has given good title

to any particular mortgage sold and assigned by him should be governed by the same rules. Indeed, section 749 puts the treasurer upon the same footing as guardians, committees, etc.; and it has been distinctly held that a guardian may so assign and transfer, before it is due, a mortgage taken by him as such, and that the purchaser acquired good title thereto, although the guardian subsequently misappropriated the amount received for the same. See Field v. Schieffelin, 7 Johns. Ch. 150, 11 Am. Dec. 441. That has been the usual practice of county treasurers to so manage such securities, see Baldwin v. Crary, 30 Hun, 422. See, also, Chesterman v. Eyland, 81 N. Y. 398.

Assuming, as I do, that the county treasurer had lawful authority to sell and transfer a mortgage which he had taken as an investment of moneys received under a decree of court directing him to invest the same, the defendant Harrington must be deemed to have acquired a good title to the one in question in exchange for the full value which he paid for the same. There was nothing to suggest that the amount was not needed for the purpose which the treasurer claimed he had in view, nothing to suggest any dishonest purpose or intent on the treasurer's part. He had the title to the mortgage, and authority to sell it; and, under the circumstances appearing in this case, Harrington might rely upon that. Spencer v. Weber, 163 N. Y. 493, 502, 57 N. E. 753.

I conclude that the judgment should be reversed, and a new trial granted; costs to abide the event. All concur.